# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | | |
|---|---|---|
| BRIAN DAVID STREBE, | ) | |
|     Plaintiff, | ) | Civil Action No. 7:17cv00321 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| BARRY KANODE, *et al.*, | ) | By: Norman K. Moon |
|     Defendants. | ) | United States District Judge |

Brian David Strebe, a Virginia inmate proceeding *pro se*, filed this civil rights action pursuant to 42 U.S.C. § 1983 alleging that defendants Barry Kanode, Warden of River North Correctional Center ("River North"), and Harold Clarke, Director of the Virginia Department of Corrections ("VDOC") (collectively "Defendants"), violated his First Amendment rights when the VDOC revised its contact visitation policy and its incoming correspondence policy. *See* Compl., Dkt. No. 1. Defendants filed a joint a motion for summary judgment asserting the defense of qualified immunity, and Strebe responded, making this matter ripe for disposition. *See* Dkt. Nos. 19, 30. Upon review of the record, I conclude that defendant's motion for summary judgment must be granted.

## I.

On or about March 13, 2017, Warden Kanode issued a memorandum letter to the River North inmate population advising inmates of upcoming VDOC policy changes. Strebe received the memorandum, which states that prison staff had "discovered a substantial amount of contraband entering [VDOC] facilities through the facility visiting room and the facility mailroom . . . [with] [a] significant portion of this contraband [being] drugs." Due to the increasing amount of contraband entering the facilities, the VDOC found it "essential" to implement new policies regarding visitation and incoming offender correspondence "in order to

ensure a high level of safety and security" for the facility. The policy changes went into effect on April 22, 2017. Mem. Letter at 1-2, Dkt. No. 1-1; *see also* Dkt. No. 19-1, Encls. A, B.

**A.**

The revised visitation policy states that inmates "will be permitted a minimum of one hour and a maximum of four hours per visiting day with visitors," and that on a "case-by-case basis," inmates can have the Facility Unit Head approve in advance an extended visit based on special need. Further, the policy restricts the vending machines located in the visiting area for inmates and visitors to only allow "selling beverages, candy bars, granola bars, and crackers (non-bag)." Mem. Letter at 1, Dkt. No. 1-1; *see also* Dkt. No. 19-1, Encls. A, B. In his verified complaint, Strebe alleges that "removing items from the vending machines and limiting the time spent [with family] during visits" diminishes the rehabilitative benefits visitation provides to inmates and does not necessarily reduce the attempts to bring drugs into the prison. Compl. 10, Dkt. No. 1.

The revised policy additionally requires inmates at all Security Level 2 and above facilities to be strip searched prior to a contact visit. After the search, inmates must change into state-issued clothing, undergarments and shoes before beginning their visit. During visitation, inmates must be escorted to a separate location to use the restroom, where he will be strip searched again before and after the bathroom use. Inmates are permitted one bathroom break per visit. Mem. Letter, Dkt. No. 1-1; *see also* Dkt. No. 19-1, Encls. A, B.

Strebe alleges that a substantially similar strip search policy was initiated in June of 2016, requiring inmates' bathrooms to be locked, forcing inmates to return to their housing unit for bathroom use and they would be stripped searched upon return to their visit. Strebe alleges this policy was initiated in response to the "claim that excessive contraband [was] entering facilities

during visitation." At a question and answer session held by the VDOC and the Virginia Citizens United for the Rehabilitation of Errants ("VACURE") in December of 2016, Marie Vargo, who is the VDOC Corrections Operations Administrator and a third party unnamed in this complaint, represented to VACURE that the June 2016 "locked bathrooms visitation policy" resulted in a "lessening of contraband."[1] Vargo stated that prior to the "locked bathrooms visitation policy," from January to June of 2016, there were 22 attempts to bring in drugs. After implementing that policy, from July 1, 2016 until December of 2016, there were only 4 attempts. *See* VACURE/DOC Meeting Notes, Ex. 2, Dkt. No. 1-1. Strebe submits that, because the "locked bathrooms visitation policy" already achieved the prison's goal of reducing the influx of drugs into the facility, the April 22, 2017 policy revisions were unnecessary. Compl. 9-10, Dkt. No. 1.

Defendants contend that the revised visitation policy was implemented because inmates and their visitors continued to use contact visits to smuggle contraband, namely drugs, into the prison via their body cavities and clothing. Certain visitors were using the bathroom facilities during visits to retrieve drugs from their body cavities or clothing and transfer it to inmates. Individuals were also using vending machine items, such as chip bags and sandwiches, to conceal contraband inside that the inmate could "surreptitiously retrieve" from the opaque snack bag or sandwich, "ingest [] later for retrieval, or conceal [] inside of his mouth." Vargo Aff. ¶¶ 52-57, 59, Dkt. No. 19-1.

**B.**

---

[1] Strebe later argues that because this policy already reduced the contraband entering the prison, defendants cannot show that the new policy, which is a more restricted measure, is needed or reasonable to achieve a goal that has "basically been met." Compl. 10.

The revised incoming mail policy, in pertinent part, states: "All incoming offender general correspondence [] at Security Level 2 and above institutions will [be] photocopied in the institutional mailroom and a maximum of three black and white photocopies pages front and back will be provided to the offender. The original envelope, letter and all enclosed contents will be shredded in the institutional mailroom . . . Offenders will be limited to receiving a maximum of three [] black and white photocopied pages front and back to include the photocopy of the envelope. Each item in the envelope, i.e., photograph, newspaper clipping, drawing, each side of a letter, etc. will be considered one photocopy." If the correspondence and its enclosed items exceed the new size limit, the revised policy requires it be returned in its entirety to the sender with a notice advising the sender of the reason for the return. Mem. Letter at 2, Dkt. No. 1-1; *see also* Dkt. No. 19-1, Encls. A, B.

The revised mail policy "still" allows inmates to send secured messages, photographs, and other attachments through the JPay tablet device system, as authorized under the previous policy. *Id*. In support of their motion for summary judgment, Defendants submit affidavits explaining that a JPay device is a small, touch-screen electronic device, like a tablet or iPad, which allows inmates to communicate with family and friends. JPay devices are specifically designed to operate within prisons and allow inmates to send and receive secured messages similar to how the public would with email messages, including text-based messages and photographs that can be stored on the device. To use this method of communication, both communicating parties must purchase "stamps" that are comparable in cost of a physical stamp used to mail a first class letter through the United States Postal Service. Defendants assert that Strebe possesses a JPay device. Vargo Aff. ¶¶ 39-45, Dkt. No. 19-1; Repass Aff. ¶ 4, Dkt. No. 19-2.

4

Inmates are additionally permitted pictures during visitation, in accordance with VDOC Operating Procedure ("OP") 803.1. Mem. Letter at 2, Dkt. No. 1-1; *see also* Dkt. No. 19-1, Encls. A, B. Defendants submit that such pictures are taken during the in-person visit, and the inmate can receive and possess the original photograph because it is delivered directly by VDOC staff. Inmates may also order and receive original photographs directly from vendors who transact with the incarcerated population and their family and friends, allowing them to upload photos that the vendor then generates into an original photograph and directly mails to the inmate. These photographs are not subject to the photocopy policy identified in the revised mail policy. Vargo Aff. ¶¶ 46-47, Dkt. No. 19-1.

Defendants submit that the revised incoming mail policy was necessary after the VDOC discovered drugs were entering the prison through the mail and resulting in both fatal and non-fatal harm to the inmate population. Between 2016 and 2017, there were sixty-one suspected drug overdoses, four confirmed deaths related to drug overdoses, and five deaths suspected to be caused by drug overdoses in VDOC facilities. Investigations into these drug overdoses or instances where drugs were found concluded that members of the public would mail concealable drugs, such as "LSD" or "acid" strips, that would allow offenders to achieve a "high." Particularly, the VDOC became aware of the increased rate of opioids being smuggled in through the mail and the increasing epidemic of opioid overdoses via Suboxone strips. These translucent medicated strips, normally prescribed to treat opioid addiction, were being easily concealed inside of letters, cards, or envelopes and going undetected by mailroom staff even when opened and inspected. VDOC implemented the revised mail policy to prevent inmates from receiving original copies of their incoming mail in the event it was being used to transfer these concealable drugs. Vargo Aff. ¶¶ 21-31, Dkt. No. 19-1.

For his alleged constitutional violations, Strebe seeks monetary damages in the amount of $5000. He additionally requests injunctive relief, seeking a court order prohibiting enforcement of the VDOC's revised visitation and incoming mail policies.

## II.

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The dispute over a material fact must be genuine, "such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). As such, the moving party is entitled to summary judgment if the evidence supporting a genuine issue of material fact "is merely colorable or is not significantly probative." *Anderson*, 477 U.S. at 250.

The moving party bears the burden of proving that judgment on the pleadings is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If the moving party meets this burden, then the nonmoving party must set forth specific, admissible facts to demonstrate a genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In considering a motion for summary judgment, the court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 322-324; *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). However, the nonmoving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874-75 (4th

Cir. 1992). The evidence set forth must meet the "substantive evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993).

Section 1983 permits an aggrieved party to file a civil action against a person for actions taken under color of state law that violated his rights under the Constitution or laws of the United States. *See Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). To state a claim under this statute, a plaintiff must establish that he has been deprived of constitutional rights through the actions of a person or persons acting under color of state law. Therefore, he must affirmatively state conduct or omissions by each of the named defendants, personally, that violated his federally protected rights.[2] *See, e.g.*, *Garraghty v. Va. Dep't of Corr.*, 52 F.3d 1274, 1280 (4th Cir. 1995); *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985).

### III.

Strebe sets forth two similar claims under the First Amendment, alleging that the VDOC's policy changes regarding (1) visitation and (2) incoming offender correspondence violated his constitutional rights. Defendants argue they did not violate Strebe's constitutional rights under the First Amendment, and that they are nonetheless entitled to qualified immunity. The determination of whether Defendants violated Strebe's constitutional rights is a component of the qualified immunity analysis, and therefore I will analyze both of Strebe's claims under the qualified immunity framework.

---

[2] To the extent Strebe brings this action against defendants in their official capacity for monetary damages, such claims are not cognizable under § 1983. "[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70 (1989). Because the prison official defendants in their official capacity are not "persons" who can be sued under § 1983, the court must dismiss Strebe's attempted claims against them and grant the defendants' motion for summary judgment with respect to these claims.

7

The doctrine of qualified immunity provides government officials with certain protections from liability for civil damages. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity extends to protect officials "for alleged constitutional violations stemming from their discretionary functions." *Raub v. Campbell*, 785 F.3d 876, 880-81 (4th Cir. 2015). In deciding whether a defendant is entitled to qualified immunity, the court considers "(1) whether the plaintiff has established the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Id.* at 881 (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

A "court 'may address these two questions in the order . . . that will best facilitate the fair and efficient disposition of each case.'" *Estate of Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 898 (4th Cir. 2016) (alteration in original) (quoting *Raub*, 785 F.3d at 881). A plaintiff's claim "survives summary judgment, however, only if [the court] answer[s] both questions in the affirmative." *Id.*

In the present case, I will determine first whether Strebe had a clearly established constitutional right to visitation or to receiving mail.

**A.**

In his first claim, Strebe alleges that the VDOC's revised policy on visitation violated his First Amendment rights by "removing items from the vending machines and limiting the time spent [with family] during visits."

It is well settled that neither the Supreme Court nor the Fourth Circuit has recognized a constitutional right to prison visitation. *See Overton v. Bazzetta*, 539 U.S. 126 (2003) (rejecting constitutional challenge to prison regulations imposing a two-year visitation ban for prisoners with multiple substance-abuse violations); *Williams v. Ozmint*, 716 F.3d 801, 807-08 (4th Cir.

8

2013) (holding in the context of qualified immunity that a visitation ban imposed on a prisoner suspected of smuggling drugs into the prison did not violate any clearly established constitutional right); *White v. Keller*, 438 F. Supp. 110, 115 (D. Md. 1977), *aff'd per curiam* 588 F.2d 913 (4th Cir. 1978) (rejecting constitutional challenge to a 90-day restriction on a prisoner visitation policy imposed after some inmates were found with contraband). Although "certain kinds of highly personal relationships" are protected under the Constitution, "[a]n inmate does not retain rights inconsistent with proper incarceration ," and "freedom of association is among the rights least compatible with incarceration." *Overton*, 539 U.S. at 131. Challenged prison regulations limiting visitation may be upheld if they serve a "rational relation to legitimate penological interests," such as "deterring the use of drugs [] within the prisons" and "induc[ing] compliance with the rules of inmate behavior." *See id*. at 132, 134.

Here, the absence of controlling constitutional authority establishing a right to visitation, let alone the quality, length, and types of food associated with visitation, forecloses Strebe's argument that the revised VDOC policy violated a clearly established constitutional right. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999) (to determine whether the asserted right was clearly established, courts need only apply "the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose"). Moreover, Strebe's visitation privileges were not arbitrarily or permanently restricted. Nor was his access to visitation suspended at all. The revised policy still allows the primary benefits of visitation while addressing the problem of inmates smuggling contraband into the prison by

limiting bathroom use to one trip and removing snack bags and sandwiches from the vending machines to prevent concealment of drugs within.[3]

Applying the above standards, I conclude that the VDOC's revised visitation policy did not violate a clearly established constitutional right. Accordingly, the first prong of the qualified immunity analysis cannot be answered in the affirmative. Thus, Defendants are entitled to qualified immunity on Strebes's claim with respect to monetary damages.

**B.**

In his second claim, Strebe alleges that the VDOC's implementation of its revised incoming offender correspondence policy violated his rights under the First Amendment. Strebe alleges that the new policy is cost-prohibitive and forces his family to spend more money on postage stamps to communicate with him due to the revised limit of pages per envelope. With respect to the requirement that prison staff photocopy and scan incoming mail, Strebe alleges that his and his family's freedom of expression will be restrained knowing that prison staff are permitted to retain and read a scanned copy of the correspondence. Additionally, Strebe argues that my task, with respect to this claim, "is to determine the proper standard for deciding whether the particular regulation or practice relating to [Strebe's] inmate correspondence constitutes an impermissible restraint of First Amendment liberties." Compl. at 7, 12, Dkt. No. 1.

At the threshold, prisoners have a First Amendment right to receive mail. *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989). The scope and potency of this right, however, is subject to limitations to allow prison officials to achieve the legitimate goals or objectives of the correctional institution. *Hudson v. Palmer*, 468 U.S. 517, 524 (1984). A prison regulation that "impinges on inmates' constitutional rights" is permissible as long as the regulation is

---

[3] Strebe does not challenge the revised visitation policy with respect to the strip search and bathroom use provisions.

10

"reasonably related to legitimate penological interests." *Thornburgh*, 490 U.S. at 409 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)); *Beard v. Banks*, 548 U.S. 521, 528 (2006) ("[R]estrictive prison regulations [including restrictions on First Amendment rights] are permissible if they are reasonably related to legitimate penological interests and are not an exaggerated response to such objectives.").

The standard that applies to regulations that censor incoming mail was established in *Turner v. Safley*, which "specifically reject[s] the application of [a] strict scrutiny [standard]," adopting instead a four-pronged test. *Montcalm Publ'g Corp. v. Beck*, 80 F.3d 105, 108 (4th Cir. 1996). Under *Turner*, courts must consider: (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates"; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action. *Lovelace v. Lee*, 472 F.3d 174, 200 (4th Cir. 2006) (quoting *Turner*, 482 U.S. at 89-92).

The inmate challenging the prison regulation bears the burden of disproving its validity. *Overton*, 539 U.S. at 132. When evaluating the constitutionality of a prison regulation, the court must accord prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979).

The revised VDOC mail policy challenged by Strebe states, in relevant part:

All incoming offender general correspondence . . . will [be] photocopied in the institutional mailroom and a maximum of three black and white photocopies pages front and back will be provided to the offender. The original envelope, letter and all enclosed contents will be shredded in the institutional mailroom . . .

11

> Offenders will be limited to receiving a maximum of three [] black and white photocopied pages front and back to include the photocopy of the envelope. Each item in the envelope, i.e., photograph, newspaper clipping, drawing, each side of a letter, etc. will be considered one photocopy.

Mem. Letter 3, Dkt. No. 19-1. For the reasons that follow, the revised VDOC mail policy passes constitutional muster under the four-pronged *Turner* test.

Under the first *Turner* factor, the parties do not dispute that there exists a "valid, rational connection" between the revised mail policy and Defendants' interest in preventing drugs and contraband from entering the prison, protecting inmate safety, and maintaining order in the prison. Thus, the first factor weighs in favor of Defendants.

Under the second *Turner* factor, Defendants argue that reasonable "alternative means of exercising the right" exist for Strebe as the policy is not a blanket ban on all incoming mail, and Strebe may still receive original photographs and private messages through vendors, in-person visitation services, and on his JPay device. Based on the record, I find that Strebe may still receive and possess uncensored copies of his mailings under the revised mail policy, just in a different form. As such, the second factor weighs in favor of Defendants.

Under the third *Turner* factor, Defendants argue that the impact of Strebe's desired accommodation – to receive all incoming mail in their original hardcopy form – would adversely affect prison staff and resources to screen and process incoming mail for drugs. This strain would continue when prison staff must address inmates who obtain drugs through the mail and overdose, sustaining fatal or non-fatal injuries. I agree. Prior to the revised mail policy, between 2016 and 2017 in VDOC facilities, there were sixty-one suspected drug overdoses, four confirmed deaths related to drug overdoses, and five deaths suspected to be caused by drug overdoses. VDOC investigations into these drug overdoses or instances where drugs were found concluded that members of the public would mail Suboxone, LSD, or acid strips that offenders

used to achieve a "high." These small, translucent strips were easily concealed inside letters, cards, and envelopes and went undetected by mailroom staff even when mail items were opened and inspected. Preventing inmates from receiving hard copies of their incoming mail, but allowing them to receive their mail as photocopies or electronic messages nonetheless, is an appropriate attempt to resolve the influx of drugs into the prison. If the revised policy was removed, as Strebe advocates, it would adversely affect the allocation of prison resources and allow the previously existing risk of the entry of drugs to continue. Due to the impact of reverting to the previous version of VDOC's incoming mail policy, I conclude that the third factor weighs in favor of Defendants.

Under the fourth *Turner* factor, Strebe argues that reinstituting the previous mail policy, or alternatively, having prison staff conduct physical tests such as fluoroscopic screening on the mail, constitute as "obvious, easy alternatives" to the revised mail policy. Based on the record, however, it is clear that Strebe's suggested alternatives would increase the administrative burden in screening incoming mail to ensure that hidden contraband is not delivered to the recipient in the original mailing. To be sure, Strebe has alternative methods to receive the type of mail he complains is not being conveyed as intended, i.e., sentimental photographs from his family, by using his JPay device or services provided by the VDOC and vendors. Moreover, Strebe's complaint that his family must spend more money on postage stamps under the new mail policy is insufficient to persuade implementation of Strebe's suggested alternatives. As such, I find no "obvious, easy alternatives" that might suggest the revised VDOC mail policy was an exaggerated response to legitimate administrative concerns. Therefore, the fourth factor weighs in favor of Defendants.

Plainly, after considering the four *Turner* factors, the revised VDOC mail policy passes constitutional muster. Because the challenged VDOC policy did not violate Strebe's First Amendment rights, I cannot answer the first prong of the qualified immunity analysis in the affirmative. Accordingly, Defendants are entitled to qualified immunity on this claim with respect to monetary damages.

**IV.**

Strebe requests injunctive relief on both of his claims, seeking a court order prohibiting enforcement of the VDOC's revised visitation and incoming mail policies.

As set forth above, Defendants are entitled to qualified immunity on both claims with respect to monetary damages. However, the "defense of [qualified immunity] is not available [in] . . . § 1983 cases against individuals where injunctive relief is sought." *Pearson*, 555 U.S. at 243; *see Ozmint*, 716 F.3d at 808 ("qualified immunity has no bearing [] on claims for prospective court action such as injunctive relief") (citing *Rowley v. McMillan*, 502 F.2d 1326, 1331 (4th Cir. 1974); *Sudler v. City of New York*, 689 F.3d 159, 177 (2d Cir. 2012)) . As such, I will address Strebe's claims for injunctive relief separately.

I previously addressed the merits of Strebe's constitutional claims within the framework of qualified immunity and concluded that the challenged VDOC policies did not violate Strebe's First Amendment rights. Notwithstanding the difference in requested relief, Strebe's failure to state a cognizable constitutional claim based on either the visitation or the incoming mail policies bars his request for monetary damages, as well as his request for injunctive relief. As such,

Strebe fails to state cognizable constitutional claims on which injunctive relief can be granted and Defendants are entitled to summary judgment.[4]

**V.**

For the foregoing reasons, Defendants' motion for summary judgment is granted. Defendants are entitled to qualified immunity on all of Strebe's claims for monetary damages. Moreover, having reviewed Strebe's claims on the merits within the framework of the qualified immunity analysis, I conclude that Strebe fails to state cognizable constitutional claims on which injunctive relief can be granted.

An appropriate order will be entered this day.

**ENTER** this  17th  day of September, 2018.

*[signature: Norman K. Moon]*
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

---

[4] Strebe also previously filed a motion to amend and a motion for preliminary injunction. *See* Dkt. Nos. 28, 31. On June 20, 2018 the court denied Strebe's motion to amend; however, I note that Strebe may file the claims in his motion to amend in a new lawsuit. Further, I will deny his preliminary injunction as unrelated and without merit. First, Strebe is not constitutionally entitled to any specific word processor, computer program, or typing apparatus. *See Lewis v. Casey*, 518 U.S. 343, 350-51 (1996) (holding there exists no free-standing right to particular resources, only the baseline of "meaningful access to the courts"); *Tarlton v. Henderson*, 467 F.2d 200, 201 (5th Cir. 1972) (asserting that "a litigant's cause is not prejudiced by the filing of a handwritten brief"); *Garlotte v. Miss. Dep't of Corr.*, 49 F.3d 728, 728 (5th Cir. 1995) (per curiam) (unpublished) (concluding that prison's ban on word processors with memory did not deny prisoners' right of access to the courts, abridge a prisoner's freedom of speech and association, or violate any other constitutional right). Second, Strebe cannot show irreparable harm from an inability to save documents on the prison computers or the law library policy change—Strebe has access to all of his legal materials because prison staff have been ordered to print off all saved legal documents at no additional charge, law library clerks are still able to assist with legal research, and Strebe has not specifically shown that the new policy would likely frustrate or impede a nonfrivolous legal claim. *Lewis*, 518 U.S. at 352. Third, the balance of the equities does not tip in Strebe's favor. Federal courts review the decisions made by prison administrators with significant deference. *Wetzel v. Edwards*, 635 F.2d 283, 288 (4th Cir. 1980). Under the policy Strebe seeks to enjoin, prisoners still receive legal research from persons with legal research experience, have access to their legal documents, and may obtain materials necessary to file lawsuits, motions, and other legal documents.